UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x



LIUBA MANKO,

                              Plaintiff,          **MEMORANDUM AND ORDER**

            - against -                           02 Civ. 10180 (NRB)

DEUTSCHE BANK,

                              Defendant.
------------------------------------------x

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Liuba Manko ("Manko") brought this action against Deutsche Bank AG New York ("Deutsche Bank") alleging violations of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the Equal Pay Act, 29 U.S.C. § 206(d), and an unlawful denial of severance benefits in contravention of Section 510 of the Employment Retirement Income Security Act ("ERISA"). On March 19, 2004, Judge Griesa of this Court granted in part Deutsche Bank's motion to dismiss the complaint, holding that Manko's age discrimination, religious discrimination and retaliation claims had not been exhausted before the Equal Employment Opportunity Commission ("EEOC") and that her Equal Pay Act claim was time-barred. See Liuba Manko v. Deutsche Bank, No. 02 Civ. 10180, 2004 U.S. Dist. LEXIS 4665 (Mar. 19, 2004). This opinion addresses Deutsche Bank's motion for summary judgment on the pending claims of gender and national original discrimination and unlawful denial

of severance benefits.[1]  For the reasons stated herein, Deutsche
Bank's motion is granted in its entirety.

## BACKGROUND

Manko is a female, Russian-born immigrant to the United States
who was employed as a junior programming analyst in Deutsche Bank's
Securities System Group ("Trader Support Group") from July 8, 1996
until she was terminated on March 23, 1999.[2]  For the better part
of Manko's tenure at Deutsche Bank, the Trader Support Group was
organized into three divisions, each of which was headed by a vice-
president who, in turn, managed several first-level supervisors and
project leaders.[3]   The division vice-presidents, Bill Louie
("Louie"), Phillip Giordano ("Giordano"), and Robert McComiskey
("McComiskey"), reported to the Director of the Trader Support

---

[1]

The parties were permitted to conduct discovery until March 31, 2007,
almost three years from the date the answer was filed.
    Though Manko had been proceeding pro se in this matter, it appears that her
submissions in opposition to Deutsche Bank's motion were drafted, at least in
part, by retained counsel. The Court received a letter from Manko dated August
14, 2007 requesting an extension of time to file an opposition because her
attorney had not, as promised, completed her brief and other submissions by
August 15, 2007.  The August 14 letter also suggested that Manko had dismissed
her attorney and intended to finish what he had started on her own. Thus, we are
not inclined to give Manko the full benefit of the rule requiring liberal
construction of briefs and other submissions filed by a pro se plaintiff who has
not received advice of counsel.  See Bertin v. United States, 478 F.3d 489, 491
(2d Cir. 2007). Nonetheless, we have recited most of Manko's specific assertions
even when they do not have legal significance.

[2]

See Defendant's Reply Rule 56.1 Statement ("Def. St.") ¶¶ 1-2.  Manko's
starting, annual base salary was $60,000.  (Def. St. ¶ 3)

[3]

See id. ¶ 8-9.

2

Group, Thomas Mollica ("Mollica").[4] The informal hierarchy within the Trader Support Group was such that Giordano exercised considerable influence across all three divisions because of his close personal relationship with Mollica.[5]

Giordano was Manko's initial supervisor at Deutsche Bank from July, 1996 to the middle of September, 1997. Manko's first performance evaluation, conducted in December, 1996, was rather positive:

> Liuba has performed well so far working 100% on the resync process. I would like to start giving her other assignments, such as End-of-Day batch programs. Liuba will begin to resolve broken programs, then will graduate to optimizing.[6]

Sometime in April or May of 1997, Giordano approached Manko during their lunch hour and asked if she would be interested in seeing him after work.[7] Manko declined, explaining that she was already in a relationship.[8]

Manko claims that her relationship with Giordano soured after this incident. Giordano apparently ignored or pretended not to understand her when she tried to initiate a conversation with him

---

[4]
Id. A fourth division was created in early 1999 and headed by Monroe Spitz ("Spitz"), who also reported directly to Mollica. (Id. ¶¶ 8-9)

[5]
See Mark Millen Affidavit ("Millen Aff.") ¶ 5.

[6]
See Def. St. ¶ 21.

[7]
See id. ¶ 23.

[8]
See Plaintiff's Rule 56.1 Statement ("P. St.") ¶ 23.

and, on approximately five occasions, mocked her accent by mimicking her pronunciation of various words and phrases.[9] Giordano also began insisting that Manko arrive promptly at 9:00 A.M. and once chastised her and Mark Millen ("Millen"), a colleague of Manko's who was also under Giordano's supervision, when they came to work late together.[10] Manko also grew concerned that she was not receiving enough assignments during office hours. On three or four occasions, she was handed an assignment at the end of the workday and had to stay past 7:00 P.M. in order to complete it in a timely fashion.[11] Manko's request to use her vacation days during the week of July 4, 1997 was denied because Giordano insisted that she work diligently towards completing a newly assigned project by the end of July. Though the project and any related reports were, in fact, completed by the specified deadline, Manko believes that Giordano did not make use of her work product until October, 1997.[12]

Millen confirmed the broad strokes of Manko's account at his deposition, in which he stated that Giordano, who was known for

---

[9]

See Def. St. ¶ 24, 26.

[10]

See id. ¶ 24, 26.

[11]

See id. ¶ 29.

[12]

See id. ¶ 27-28; P St. ¶ 28. At her deposition, Manko testified that Daniela Totino ("Totino"), Giordano's receptionist, was "spying" on her in the women's restroom and speculated that this intrusion was borne of Giordano's suspicion of her drug use. (Def. St. ¶ 30)

4

"chasing women" in the office,[13] initially pursued Manko but then became "irritated" with her as time passed.[14]  Although Millen regularly arrived to work after 9:00 A.M. and closer to 10:00 A.M., the only time anyone had objected to his tardiness was when he and Manko were jointly reprimanded by Giordano.[15]

Manko had a similar experience with Mollica.  Following a business dinner attended by Mollica, Manko, and other members of the Trader Support Group in the summer of 1997, Mollica asked Manko if she would like to join him for a drink at the bar in the restaurant.  Though Manko declined, Mollica extended the same invitation to, and was joined by, another member of his staff, Siew Leo, with whom he had a strictly professional relationship.  Manko stated that, after this incident, Mollica did not respond to her greetings but acknowledged that, by the end of the year, they were cordial and professional with each other.[16]

In the fall of 1997, Manko asked Mollica for a transfer to another division of the Trader Support Group.  Within a few days of

---

13

See id. ¶ 29.  Manko and Millen base this rather serious accusation on their observation of Giordano's interactions with Kavita Saigal and other female employees and consultants within the Group. (P. St. ¶ 29)

14

See id. ¶ 29.

15

See P. St. ¶ 29; Millen Aff. ¶ 3.  According to Millen, at least two other male employees in the department, Ken Strogov ("Strogov") and Manmohan Sahni ("Sahni"), were often late to work but suffered no adverse employment consequences.  Id.

16

See Def. St. ¶¶ 95-98.

this request, Manko was staffed to Louie's division, where her immediate supervisor was Monroe Spitz.[17]  Apart from some brief interactions in November, 1997, Manko and Giordano did not speak to each other following her transfer.[18]  Though Manko's relationship with Spitz started on a high note, it rapidly deteriorated to the point where he would avoid speaking to her for days at a time, ask Aynlender and other employees in the Group, but not her, to be the point of contact when he was out of the office, and assign projects towards the end of the work day so that she would have to stay past 7:30 P.M.  Manko was also offended by the fact that he repeatedly greeted her with expressions such "qu'est ce que c'est" and "ma nishtanah halailah hazeh" and told her that he wanted certain projects completed "quick and dirty."[19]

In November, 1997, Giordano sent a series of e-mails to all personnel in the Trader Support Group, informing them that they were expected to: (i) sign in and out of work for a four week period commencing on November 12, 2007, after which "only the bad apples would [] be required to fill in the sheet"; (ii) reduce the number of their outgoing personal phone calls; and (iii) work a full eight-hour day on Saturdays with Deutsche Bank reimbursing

---

17

See id. ¶¶ 31-32.

18

See id. ¶¶ 33-36.

19

See P. St. ¶ 62.

6

employees for meals and transportation expenses.[20] The sign-in and weekend work requirements, unprecedented in the recent history of the Trader Support Group, were lifted less than four weeks after they went into effect.[21]

According to Manko, in January, 1998, Louie suggested that she start looking for another job because Giordano wanted her fired and had, in fact, required the entire Trader Support Group to sign in and out of work in November, 1997 for the purpose of documenting her work hours.[22] Later that month, Louie wrote Manko a short letter of reference that stated, in pertinent part:

> During her employment here [Manko] has proven to be technically competent and shown the flexibility to work in many projects with differing staff members. She has made many releases into our production environment without incidence. I believe she will be an asset to any system she supports.[23]

Manko's second performance evaluation, received sometime in February, 1998, reflected Giordano's input, as well as Louie's, because Giordano had been Manko's supervisor for the better part of 1997. The evaluation reported an overall rating of "2" out of a

---

[20]

See Def. St. ¶¶ 36-41. The e-mail concerning personal phone calls was prompted by complaints that the Trader Support Group's personal phone charges were excessive. (Id. ¶ 41) With respect to employees working over the weekend, Louie noted that only Mollica could have authorized the expense reimbursements. (P. St. ¶ 38)

[21]

See id. ¶¶ 38-41, Def. St. ¶ 40.

[22]

See P. St. ¶¶ 39-40; Millen Aff. ¶ 6.

[23]

See Def. St. ¶ 54.

7

maximum of "5," indicating that she infrequently met expectations, and also listed five specific recommendations for improvement, including:

>      Liuba must foremost improve her ability to arrive at work and at meetings on time. This means arriving at work by 9:00am and at meeting [sic] at their designated start time.
>      Liuba must complete more assignments and at a quicker pace; more in line with her peers.
>      Liuba must separate her personal life from her working day. This means reducing the number of personal phone calls and personal errands.
>      Liuba should concentrate more on learning systems and becoming more self-reliant in accomplishing her tasks.
>      Liuba should active {sic] seek/create assignments to improve her system as well as provide assistance to others.

\*\*\*

>      If Liuba adheres to the above recommendations she will become an important member of the DB Trader team.[24]

In June, 1998, Manko met with Anthony McCarthy, the Managing Director of the Trader Support Group and Mollica's superior, to request a transfer to another group within Deutsche Bank. Manko complained that: (i) the 1997 year-end review of her performance was unfair and biased; (ii) her relationship with Giordano had faltered and he had been "harassing" her and orchestrating her termination; (iii) management treated her, both socially and professionally, worse than any other employee in the Group; (iv) she was undercompensated, not promoted within the Group, and

---

[24]

See P. St. ¶ 56.

8

needlessly required to arrive at work by 9:00 A.M.;[25] (v) her supervisors had repeatedly denied her requests for access to the production environment and a beeper until a few months before her meeting with McCarthy and also failed to provide her with the documentation for the various systems she supported, which would enable her to achieve greater self-reliance and independence from them; and (vi) Spitz, her current supervisor, had grown hostile towards her and favored Sandra Aynlender ("Aynlender"), a Russian-born woman who was hired as a consultant in January, 1998 and quickly rising through the ranks.

McCarthy apparently referred the matter back to Louie, who then met with Manko periodically to outline management's expectations of employees within the Group as well as informally review her improvement. In the first of these meetings, held on August 27, 2008, Louie stressed the importance of arriving promptly at 9:00 A.M. and explained that Manko's performance and timeliness would be monitored over the coming months and the failure to make sustained improvements could result in formal disciplinary action.[26] Several months later, Louie issued a formal mid-year performance

---

25

According to Manko, McCarthy acknowledged at this meeting that her starting, annual salary should have been closer to $75,000.

26

Louie also mentioned that compensation within the Trader Support Group was a function of her relative merit and performance, and not merely experience. The next day, Louie had a conversation with Manko in which she indicated her willingness to come into work on time in consideration for either a $20,000 increase in her annual compensation or a two-year consulting contract at the rate of $70-75/hour. (Def. St. ¶¶ 66-68)

9

evaluation addressing Manko's recent progress:

> Liuba has improved in arriving to work earlier.
> However, her arrival time of between 9:30 to 9:45
> am is still too late. Her users are at work and
> expect support at 9:00 am. It is noted that
> Liuba's attitude and work performance has recently
> improved. This improvement must be sustained and
> built upon. If Liuba strengthens her knowledge of
> the system she supports, arrives at work on time
> and supports her users and staff members
> independently as well as expeditiously, she will
> become a strong member of the custody team.[27]

Manko's improved performance was not sustained and in her 1998 end-of-year review she, once again, received the second lowest overall rating. Under the section titled "Manager's Comments", the evaluation provided:

> Liuba needs to arrive to work and meetings on time.
> Any recent improvements in the area was [sic] not
> sustained. Liuba must strengthen her knowledge of
> the system she supports and be able to resolve
> problems independently. She should focus on adding
> value to the business and not on comparing herself
> with the staff.[20]

In early March, 1999, Spitz inquired about the status of a project that had been assigned to Manko in late 1998. Manko reported that, because Spitz had suggested that her modifications could be rendered obsolete by Deutsche Bank's decision to upgrade to an entirely new system, she had stopped working on the project.[29]

---

[27]

See id. ¶ 69.

[28]

See id. ¶ 70. By this time, Spitz had been appointed a vice-president within the Trader Support Group and Manko reported directly to him rather than to Louie. See supra note 3; Def. St. ¶ 83.

[29]

See P. St. ¶ 76-77.

10

On March 10, Manko received a memorandum entitled "Final Notice –
60 Day Probation," which informed her that the Bank would terminate
her employment unless she made "immediate and sustained
improvement" in four specific areas: (i) arriving to work at 9:00
A.M. each day; (ii) furnishing prompt status reports of the work
she performed; (iii) completing assignments in a timely fashion;
and (iv) cooperating with reasonable work-related instructions.[30]
One week later, Spitz sent Manko an e-mail indicating that her most
recent status report was not sufficiently detailed to permit an
evaluation of her work product and reminding her of management's
concerns regarding her timeliness:

> You arrived at work at 9:28 AM today. This is
> unacceptable. In addition, since you were placed
> on final probation on 3/10/99, I have observed you
> arrive at work by 9:00 a.m. only once. On each of
> the five other business days, you have arrived at
> work after 9:00 AM. This is an unacceptable
> pattern. <u>This is the final warning</u>.[31]

Manko's e-mail reply stated:

> Business day begins after 9:00 AM and not before.
> Half of the employees in the department arrive to
> work after 9:00 AM.
> Arrival between 9:00 AM and 9:15 AM was never
> considered to be late even in the companies with
> the strict rules.
> Don't mix up our unsatisfactory personal
> relationship with work relationships.

---

[30]

See Def. St. ¶ 76-77. At the time, Manko was tasked with testing
modifications to her system but could only perform those tests after 5:30 P.M.
to avoid interference with daily production cycles. Thus, if she chose to comply
with her superior's requests regarding her tardiness, Manko would have had to
work more than an eight-hour day. (P. St. ¶ 74)

[31]

See Def. St. ¶ 74.

11

Your hostile messages will not speed up completion
of the project it will only slow it down because I
have to answer your messages.
By the way what does it mean "final warning,"
"final warning" before what? Maybe I don't need to
finish this project at all?

***

I can't promise you my arrival before 9:00 AM
everyday, I'll try to be as close as possible to
9:00 AM.[32]

After consulting with Louie, Spitz, and Mollica, Kim Albert-
McLaughlin, the Bank's Director of Human Resources, concluded that
this e-mail was demonstrative of Manko's insubordinance and lack of
commitment to working in a professional manner and terminated Manko
on March 23, 1999.[33]

# DISCUSSION

## I. Legal Standard

A motion for summary judgment must be granted "if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue of material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
The court must view the evidence in the light most favorable to the

---

[32]

See id. ¶ 81. At her deposition, Manko clarified that the phrase "personal
relationship" was not intended as a reference to an "intimate" relationship with
Spitz. (P. St. ¶ 81).

[33]

See id. ¶ 83.

12

nonmoving party, resolving all ambiguities and drawing all justifiable inferences in favor of that party, eschewing determinations of credibility, weighing of evidence, and other functions properly left to a jury. See Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005). The moving party bears the burden of showing that he or she is entitled to summary judgment, and if the nonmoving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary judgment is appropriate. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004).

The Second Circuit has stated that district courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Gallo v. Prudential Residential Services, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, summary judgment in an employment discrimination case may still be appropriate if the plaintiff relies "on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." Toizan v. Mew York Presbyterian Hosp., No. 00 Civ.

13

6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003). This

is because, as the Second Circuit has stated:

> [t]he summary judgment rule would be rendered
> sterile ... if the mere incantation of intent or
> state of mind would operate as a talisman to defeat
> an otherwise valid motion. Indeed, the salutary
> purposes of summary judgment-avoiding protracted,
> expensive and harassing trials-apply no less to
> discrimination cases than to commercial or other
> areas of litigation."

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see also
Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.
2001).

## II.  Timeliness of Manko's Title VII Claims

"In states such as New York that have an agency with the

authority to address charges of discriminatory employment

practices, the statute of limitations for filing a charge of

discrimination with the EEOC is 300 days."  Butts v. City of N.Y.

Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir.

1993).  This limitations period begins to run from the date that

each discrete act, "such as termination, failure to promote, denial

of transfer, or refusal to hire," occurs.  Nat'l R.R. Passenger

Corp. v. Morgan, 536 U.S. 101, 114 (2002).  A claim of gender

discrimination alleging a hostile work environment does not suffer

the same fate.  "Provided that an act contributing to the claim

occurs within the filing period, the entire time period of the

hostile environment may be considered for the purposes of

14

determining liability." Bogle-Assegai v. Connecticut, 470 F.3d 498, 502 (2d Cir. 2006) (citing Nat'l R.R. Passenger Corp., 536 U.S. at 114).

Here, Manko filed identical complaints with the New York State Division of Human Rights and the Equal Employment Opportunity Commission on July 17, 1999. Deutsche Bank concedes that the allegations in those complaints fairly give rise to Title VII claims for: (i) national origin discrimination; (ii) gender discrimination; and (iii) more specifically, a hostile work environment. With respect to Manko's hostile work environment claim, the Court may properly consider any relevant incidents predating the start of the filing period. However, Manko is precluded from recovering on any discrete, unlawful employment practices that form the basis for her national origin and other sex discrimination claims and occurred prior to September 16, 1998.[34]

### III. Disparate Treatment on the Basis of Sex and National Origin

Title VII of the Civil Rights of Act of 1964 makes it an unlawful employment practice for employers:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,

---

[34]

Nonetheless, evidence of prior acts may be relied upon as "background evidence" in support of any claims based on unlawful employment practices that fall within the filing period. Nat'l R.R. Passenger Corp., 536 U.S. at 114.

sex, or national origin . . . .

42 U.S.C. § 2000e-2(a). To avoid dismissal on a motion for summary judgment, a plaintiff must withstand the three part burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see McPherson v. New York City Department of Education, 457 F.3d 211, 215 (2d Cir. 2006).

First, the plaintiff must establish a prima facie case by demonstrating: (1) that she is a member of a protected class; (2) that her job performance was satisfactory; (3) that she suffered from an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See DeMoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802). If the plaintiff can demonstrate a prima facie case, the burden then shifts to the defendant employer to provide a legitimate non-discriminatory reason for the adverse employment action. Id. If such a showing is made by the defendant, then the burden shifts back to the plaintiff to prove that discrimination indeed existed, for example, by showing that the employer's proffered reason is mere pretext. Id. However, it is important to note that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff. Thus, once the employer has proffered its nondiscriminatory reason, the employer

16

will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)).

Here, Manko has demonstrated neither that her job performance was satisfactory nor that the circumstances surrounding the adverse employment actions occurring after September 16, 1998 give rise to an inference of unlawful discrimination.

Satisfactory job performance "depends on the employer's criteria for the performance of the job - not the standards that may seem reasonable to the jury or judge." Thornley v. Penton Publishers, 104 F.3d 26, 29 (2d Cir. 1997). A plaintiff's "job performance cannot be assessed in a vacuum; the ultimate inquiry is whether [the] performance 'meets his employer's legitimate expectations.'" Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985). Accordingly, courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance. Id.

Manko cannot establish that she was adequately performing her job at the time of the allegedly discriminatory acts. Deutsche Bank has introduced substantial evidence of the importance of employees in Manko's position being knowledgeable about the systems for which they are responsible, managing projects and assignments

17

independently, and arriving at work by 9:00 A.M.[35]  Indeed, Manko's supervisors repeatedly laid out these expectations in her performance evaluations, and yet, each subsequent evaluation highlighted her deficiencies in performing the previously described responsibilities. After five warnings from three supervisors over a sixteen-month period, Manko had fair notice of the aspects of her performance that needed improvement, see, e.g., Williams v. Alliance National Inc., No. 98 CV 7984, 2001 WL 274107, at *4-5 (S.D.N.Y. 2001) (second prong of prima facie case not satisfied when employee receives consistently poor evaluations or warnings regarding their performance and fails to conform), and her continued failure to conform indicates a lack of qualification for the position for which she was hired. See, e.g., Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001).

Moreover, even assuming arguendo that her performance was adequate, Manko has wholly failed to demonstrate that her supervisors' discriminatory treatment was animated by improper motives.[36]  The Trader Support Group was remarkably diverse: At the

---

35

See Def. St. ¶¶ 38-47, 56, 69, 70, 74, 77, 80.  Manko concedes that the policy requiring employees and consultants to arrive to work by 9:00 A.M. applied uniformly across the Trader Support Group and that she repeatedly sought to justify late arrivals or obtain variances from the policy. (P. St. ¶¶ 48, 51, 68)

36

Manko suggests that her supervisors' tolerance for tardiness by male employees and consultants within the Trader Support Group is evidence of gender bias. Though two male employees, Manmohan Sahni and Kayolan Strogov, routinely showed up to work late, Deutsche Bank has offered unrebutted evidence that both Sahni and Strogov had made special arrangements with their supervisors to arrive to work after 9:00 A.M. because of child care issues. (Def. St. ¶ 48-49) Millen, a white male employee, apparently never received a private warning regarding his late arrivals. As a threshold matter, Manko has not adduced any

18

time Manko was hired, six of the twenty-nine employees and consultants were women and four were of Russian origin; as of early March, 1999, ten of the thirty-four employees and consultants in the Group were women and seven were of Russian origin.[37] Benjamin Shoichet, Jennifer Kravstova, and Anatoly Vaynshteyn, all three of whom are Russian natives, were offered positions as full-time employees at the higher rates of pay that Manko claims she should have received.[38] Aynlender and Marina Miller, both women of Russian origin, were retained as female consultants in January, 1998, and Aynlender was eventually promoted to project leader and then assistant vice president.[39] Three other women, Siew Leo, Philomena Dunn, and Lilliam Builles, were promoted to associate and then

---

evidence that: (i) her supervisors had knowledge of Millen's conduct; (ii) Manko's tardiness was of the same nature or character as Millen's; or (iii) Millen's professional duties were coextensive with Manko's. More importantly, however, Manko conveniently sidesteps the fact that Millen was ignored, given nothing to do during office hours, generally disfavored within the Group and eventually forced to seek another job. (Millen Aff. ¶ 3) Thus, even assuming that Manko and Millen were similarly situated, there is no evidence to support Manko's contention that they were ultimately treated any differently.

We also reject Manko's suggestion that she was discriminated against because of her "strong Russian accent." Though Giordano's comments about Manko's accent "may be probative of discriminatory intent," see Thelusma v. New York City Bd. of Educ., 2006 U.S. Dist. LEXIS 64855, at *6 (E.D.N.Y. Sept. 26, 2006), there is no record evidence that her accent was the basis for an adverse employment action. Moreover, Manko conceded that other Russian women in the Group who were not subjected to the alleged discrimination, such as Aynlender, Miller, and Kravstova, had similarly "strong" accents. (Def. Reply ¶ 86)

37  
    See id. ¶ 12-17.

38  
    See id. ¶ 90.

39  
    See id. ¶ 13-15.

19

assistant vice president during Manko's tenure at Deutsche Bank.[40] Manko concedes that other female and Russian consultants and employees were provided with beepers, access to the production environment, and documentation to the systems they supported.[41] By all accounts, Aynlender, who effectively replaced Manko within the Group, received the professional supports that Manko alleges were denied to her.[42] See, e.g., Montanile v. Nat'l Broad Co., 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002); Smith v. Madison Square Garden, 1997 WL 151406, at *3 (S.D.N.Y. Mar. 31, 1997).

Even if we were to assume that Manko has established these predicates of unlawful discrimination, we would nonetheless hold that she has not met her further burden of demonstrating that Deutsche Bank's stated reasons for the various adverse employment actions occurring after September 16, 1998 were merely pretexts for unlawful discrimination. Mere disagreements with the underlying facts and conclusions of the evaluations and assessments that ultimately formed the basis for an employment decision cannot, standing on their own, sufficiently establish the employer's invidious motivation. See, e.g., Ricks v. Conde Nast Publications, Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000); Taylor v. Polygram Records, 1999 WL 124456, at *10 (S.D.N.Y. Mar. 18, 1999). In order

---

40

See id. ¶ 90.

41

See P. St. ¶ 90.

42

See Def. St. ¶ 85.

20

to convince the Court of her unique plight, Manko repeatedly and vehemently asserts that she was treated worse than any other employee or consultant in the Trader Support Group. This statement fails to appreciate that, in Manko's case, disparate treatment on any basis other than sex and national origin is not cognizable under Title VII. Given the unrebutted evidence of the diversity within the Trader Support Group and the lack of any indication that employment decisions were grounded in impermissible motives, Manko's statement constitutes a concession rather than an argument in favor of the viability of her claims. See, e.g., Montanile v. National Brand Co., 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002); Smith v. Madison Square Garden, 1997 WL 151406, at *5 (S.D.N.Y. Mar. 31, 1997); Thornton v. Simpson Thatcher & Bartlett, 1986 WL 6012 (S.D.N.Y. May 21, 1986). Absent any material issues of fact relevant to Manko's discrimination claims, summary judgment to Deutsche Bank is proper.

## III. Sexual Harassment

A plaintiff seeking relief against an employer for sexual harassment in the work place can proceed under two theories: direct discrimination (the so-called "quid pro quo" variety); and "hostile workplace environment" harassment. See Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir. 1989). "When a plaintiff proves that a tangible employment action resulted from

21

a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). If, however, a "claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." Id. at 754. "The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility." Id. at 751 (emphasis omitted).

"[T]o establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994). The test for a hostile work environment requires the plaintiff to establish that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks

22

omitted). "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).

As best as we can discern from the pleadings and the submissions in opposition to Deutsche Bank's motion, Manko has two sexual harassment claims, which allege that: (i) her rejection of Giordano and Mollica's advances was followed by a steady deterioration in the terms and conditions of her employment; and (ii) these advances, together with Spitz's use of the expressions "qu'est ce que c'est," "ma nishtanah halailah hazeh," and "quick and dirty," gave rise to a hostile work environment. Both these claims fail at the most fundamental levels.

Deutsche Bank is entitled to summary judgment on the quid pro quo claim because there is no indication that Mollica made any sexual overtures or demands or that either Giordano or Mollica used Manko's reaction to their advances as the basis for employment decisions. To be clear, Manko has not adduced any evidence of sexual harassment by Giordano and Mollica other than their one-time invitations to socialize outside of the office. While we recognize that Manko has introduced background evidence of Giordano's reputation for "chasing women" in the office, and thus, his advance could be reasonably construed as a request to begin a romantic relationship, Manko's interaction with Mollica was wholly innocuous

23

and gender-neutral. Merely inviting a female colleague to socialize after work patently fails to rise to the level of a sexual overture. Of course, "requests for sexual activity are not always made explicitly," Gallagher v. Delaney, 139 F.3d 338, 346 (2d Cir. 1998), but where, as here, Manko has not suggested that Mollica persisted in making unwelcome advances, his statements or conduct were erotic or sexually suggestive, or that he had Giordano's alleged reputation for "chasing women," Manko has not met her burden of establishing the sexual nature of Mollica's conduct.

The second defect in Manko's quid pro quo claim is the lack of evidence that her rejection of Giordano and Mollica's advances was the basis for an adverse employment decision occurring within the statutory limitations period. Given that the incidents in question occurred in the spring and summer of 1997, outside the applicable limitations period, the causal nexus between Manko's rejections and complained of employment decisions is, at best, tenuous. See, e.g., Adeniji v. Administration for Children Services, NYC, 43 F. Supp. 2d 407, 433-34 (S.D.N.Y. 1999) (citing cases). Further taking account of the non-discriminatory reasons advanced by Deutsche Bank, Mollica and Giordano's lack of direct supervisory authority over Manko,[43] Manko's failure to introduce affirmative

---

[43] Indeed, Louie submitted an affidavit in support of defendant's motion stating "Mr. Giordano had no supervisory authority over Ms. Manko after 1997. Mr. Giordano also never recommended that I terminate Ms. Manko's employment or take any adverse action against her." Bill Louie Affidavit ("Louie Aff.") ¶ 5

24

evidence of Giordano or Mollica's intervention (or desire to intervene) in the review process to punish Manko for her rejections, and the fourteen-month lapse between the allegedly harassing conduct and the first set of adverse employment decisions, Louie's performance evaluations conducted in November, 1998 and February, 1999, no reasonable juror could conclude that the proffered rationales were pretexts for retaliation.

Manko's hostile work environment claim borders on frivolous. Though injecting the phrases "qu'est ce que c'est," "ma nishtanah halailah hazeh," and "quick and dirty" into casual conversation may be annoying, this practice is objectively devoid of sexual connotation, particularly when, as Manko concedes, the first two phrases were used as greetings and the latter was employed to communicate the manner in which Spitz wanted recently assigned projects completed.[44] Even assuming that Giordano and Mollica's advances and Spitz's non sequiturs arguably had an implicit sexual component, a reasonable juror could not conclude that these interactions, which occurred over an eighteen-month period, were sufficiently severe or pervasive to alter the conditions of Manko's employment and create an abusive working environment.[45] See, e.g.,

_____

(emphasis added).

[44]
    See Def. St. ¶¶ 99-102.

[45]
    Manko also claims that Spitz invited her to accompany him to several meetings on the impending Y2K problems because he believed that her lack of knowledge about the subject matter would be an asset and she would be able to give him unencumbered advice. (P St. ¶ 134) Though we fail to see how a

25

Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004);
Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998).

Accordingly, Deutsche Bank is granted summary judgment on
Manko's sexual harassment claim.

## IV. Interference with Severance Benefits

We turn to address Manko's claim of unlawful denial of
severance benefits, which may be properly grounded in New York
contract law or Section 510 of the ERISA.[46] Since a Section 510
claim would be time-barred, see Sandberg v. KPMG Peat Marwick,
L.L.P., 111 F.3d 331, 336 (2d Cir. 1997) (two-year statute of
limitations period), we proceed to analyze Manko's claim for
severance benefits as if she had pleaded a breach of contract.

Though Manko's employment agreement is silent on the issue of
severance, Deutsche Bank's Human Resources policies in effect at
the time of Manko's termination provided that employees were
entitled to receive severance benefits if, and only if, their
position was eliminated due to a restructuring.[47] In January, 1999,

_____

reasonable juror could understand Spitz's statement to be insulting, much less
discriminatory, even if this incident were included among the others identified
by Manko as giving rise to a hostile work environment, we would nonetheless rule
that the severity and pervasiveness of the allegedly discriminatory conduct was
not sufficient to alter the terms and conditions of Manko's employment.

[46]

Section 510 of the ERISA states that an employer may not "discharge, . .
. or discriminate against a participant or beneficiary . . . for the purpose of
interfering with the attainment of any right to which such participant may become
entitled under the plan." 29 U.S.C. § 510.

[47]

See Manko Deposition ("Manko Dep.") Ex. 7, 10; Louie Aff. Ex. I, J.

Manko attended a meeting of all Deutsche Bank employees at which
management announced that certain positions within the Bank would
be eliminated as a result of a planned merger with Banker's Trust
and that, pursuant to the corporate policy, the affected
individuals would receive a severance package equal to one-half
their salary and one-half their annual bonus for the previous year.
In his affidavit filed in support of Deutsche Bank's motion, Louie
stated that "[a]t the time Ms. Manko's employment was terminated,
the management of the DB Trader Support Group was not aware whether
there would be any reduction in headcount in the Group in the near
future. Although two employees were affected by a reduction-in-
force several months after Ms. Manko's termination, we had no
information at the time Ms. Manko's employment terminated that
there would be reduction in headcount in our Group."[48]

The record evidence clearly establishes that Manko's
termination was precipitated by her supervisors' assessment that
she failed to meet the standards of professionalism and competency
within the Trader Support Group and not by Deutsche Bank's
restructuring plans. Thus, Manko has failed to establish a breach
of her employment agreement or any other obligation of Deutsche
Bank under its severance policy. Even if a Section 510 claim is
not time-barred or Manko's employment agreement could be understood
to include an implied covenant of good and fair dealing that would

[48]

See Louie Aff. ¶ 18.

27

be breached by an intentional interference with severance benefits, we would note that Manko has failed to rebut management's denials of any knowledge of specific workforce reductions in the Trader Support Group. We reject Manko's oblique suggestion that Spitz's March 10, 1999 statement, "even [a] severance package has to be earned,"[49] somehow supports her claim because that observation is entirely consistent with Deutsche Bank's policies, which neither promise nor deny severance benefits to employees who are terminated for reasons other than a reduction in force.

Accordingly, summary judgment to Deutsche Bank is granted on Manko's claim for severance benefits.

## CONCLUSION

Deutsche Bank's motion for summary judgment on Manko's claims of gender and national origin discrimination and failure to pay severance benefits is GRANTED in its entirety.

IT IS SO ORDERED.

DATED: New York, New York
March 28, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[49] See Def. St. ¶¶ 78-79.

28

Copies of the foregoing Memorandum & Order have been mailed on this date to the following:

Plaintiff

Liuba Manko
307 East 77th Street, Apt 2F
New York, NY 10021

Counsel for Defendant

James G. Murphy, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177